McGEE, Chief Judge.
 

 *887
 
 Rachel Sheri Wilson-Angeles ("Defendant") appeals from judgment entered after a jury found her guilty of attempted first-degree arson and being intoxicated and disruptive in public.
 

 I.
 
 Background
 

 Defendant was casually talking to her neighbor, Sharon Houston ("Houston"), outside Houston's apartment in their apartment complex in Mooresville, North Carolina, just before midnight on 20 December 2011. The two had been neighbors for a few years, and were known to occasionally visit and talk with each other in the evenings. That evening, Defendant had been drinking, and "flipped out." Defendant began cursing at Houston and accusing her of being responsible for Defendant's children being taken away from her. After a brief physical altercation, Houston retreated into her apartment and locked the door. About five minutes later, Houston heard a commotion just outside her door. Houston peered through the peephole, and observed Defendant outside with a Mad Dog 20-20 bottle (a brand of fortified wine) in her hand. A rag was protruding from the bottle, effectively making a "Molotov cocktail," that Defendant lit and threw against Houston's door. Houston testified at trial that she heard a "whoosh" sound as the flame "went up." Houston also heard Defendant "cussing" and "saying she was going to burn me out." Houston called 911.
 

 *661
 
 As Houston waited for law enforcement to arrive, she went outside her apartment to assess the damage. The fire had gone out on its own, leaving behind black soot, roughly three inches in diameter, on the brick wall near her front door. Houston swept up the pieces of broken glass from the bottle and disposed of them in the trash. When law enforcement arrived at the apartment complex, they immediately observed a woman, later identified as Defendant, yelling obscenities and loudly proclaiming
 
 *888
 
 she "was the victim." As law enforcement approached Defendant, she quickly handed a container she was holding to another person, who poured out the liquid. Despite the liquid being poured out, the container had a strong odor of alcohol. Defendant claimed to law enforcement that she was bleeding, and repeatedly attempted to remove her clothing to show the officers her injuries. One of the officers who encountered Defendant, Officer Brian Plyler ("Officer Plyler"), noticed a strong odor of alcohol emanating from Defendant's mouth, and observed that she appeared "extremely intoxicated." Defendant was, according to Officer Plyler, screaming at a large group of people who had assembled to witness the spectacle, and it seemed to him that Defendant was attempting to "incite more violence." Based on these observations, Officer Plyler placed Defendant under arrest for being intoxicated and disruptive in public. During the ride to the police station, and while at the station, Defendant exhibited other signs of being intoxicated, including inexplicably singing hymns, repeatedly claiming to be the victim, and later passing out at the police station.
 

 Subsequent to Defendant's arrest, Officer Plyler's superior, Captain Joseph Cooke ("Captain Cooke"), talked with Houston. Houston described the physical altercation between herself and Defendant, and told Captain Cooke about Defendant's attempt to start a fire at her front door. Captain Cooke explained at trial what he observed at Houston's front door:
 

 I saw broken glass from what looked like a bottle had been shattered on the door. There was liquid on the door. There was also carbon mark or a charring-not really charring, but a mark about three inches in diameter on the concrete in front of her door that I had could see that something had just been recently burned. Basically it looked like, you know, bottle was thrown on the bottom of her door, shattered, and liquid was all over the place, and something had been tried to set on fire.
 
 [1]
 

 Based on his observations and conversation with Houston, Captain Cooke instructed the other officers to also charge Defendant with attempted first-degree arson.
 

 Defendant's trial began on 7 October 2014. During the course of the trial, the State sought to introduce the testimony of three witnesses-Jason
 
 *889
 
 Workman, Chris Jorgenson, and Gary Styers ("the 404(b) witnesses")-who were to testify regarding Defendant's perpetration (or attempted perpetration) of two prior arsons, both occurring at properties in Mooresville, North Carolina in August 2008: one at a property on Main Street (the "Main Street Arson"), and another at a property on Mills Street (the "Mills Street Arson").
 

 After
 
 voir dire
 
 of the 404(b) witnesses, the trial court ruled that evidence regarding the Mills Street Arson was relevant, but its probative value was outweighed by its unduly prejudicial effect, rendering it inadmissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 403. The trial court further ruled that the testimony regarding the Main Street Arson was relevant and would be admitted pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b) for the sole purpose of showing Defendant's intent to commit arson. In so ruling, the trial court also held that evidence of the Main Street Arson was more probative than prejudicial, and admissible pursuant to N.C.G.S. § 8C-1, Rule 403. Defendant was found guilty of attempted first-degree arson and being intoxicated and disruptive in public. The trial court determined Defendant to be a prior record level III offender for sentencing purposes, and sentenced her to a prison term
 
 *662
 
 of thirty to forty-eight months. Defendant appeals.
 

 II.
 
 Analysis
 

 Defendant argues the trial court erred by: (1) admitting evidence, pursuant to N.C. Gen. Stat. §§ 8C-1, Rules 401, 403 and 404(b), that she had previously committed the Main Street Arson; and (2) by including Defendant's probation, parole, or post-release supervision in her prior record level calculation for sentencing purposes in violation of N.C. Gen. Stat. § 15A-1340.16(a6) 's notice requirements. Defendant also argues that she received ineffective assistance of counsel when her trial counsel failed to request a jury instruction on voluntary intoxication.
 

 A.
 
 Admission of Prior Bad Acts to Show Intent
 

 Defendant argues the trial court erred in admitting evidence of the Main Street Arson, and that the admission of this evidence violated N.C. Gen. Stat. §§ 8C-1, Rules 401, 403, and 404(b). We address these arguments together.
 

 Rule 404(b) of the North Carolina Rules of Evidence provides, in relevant part:
 

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be
 
 *890
 
 admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
 

 N.C. Gen. Stat. § 8C-1, Rule 404(b) (2015). Rule 404(b) has been characterized as a "clear general rule of
 
 inclusion
 
 of relevant evidence of other crimes, wrongs or acts by a defendant."
 
 State v. Coffey
 
 ,
 
 326 N.C. 268
 
 , 278-79,
 
 389 S.E.2d 48
 
 , 54 (1990) (emphasis in original). This clear rule of inclusion is "subject to but
 
 one exception
 
 requiring its exclusion if its
 
 only
 
 probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged."
 

 Id.
 

 (emphases in original). Despite these sweeping and inclusive statements, our Supreme Court has also stated that Rule 404(b) is "consistent with North Carolina practice prior to [the Rule's] enactment."
 
 State v. Carpenter
 
 ,
 
 361 N.C. 382
 
 , 386,
 
 646 S.E.2d 105
 
 , 109 (2007) (citation and quotation marks omitted). "Before the enactment of Rule 404(b), North Carolina courts followed the general rule that in a prosecution for a particular crime, the State
 
 cannot offer evidence
 
 tending to show that the accused has committed another distinct, independent, or separate offense."
 

 Id.
 

 (emphasis added) (citation, ellipsis, and brackets omitted). Attempting to reconcile these seemingly disparate commands, our Supreme Court has stated that "while we have interpreted Rule 404(b) broadly, we have also long acknowledged that evidence of prior convictions must be carefully evaluated by the trial court."
 
 Id.
 
 at 387,
 
 646 S.E.2d at 109
 
 .
 

 When determining whether evidence of a prior crime or bad act is admissible under Rule 404(b), two considerations are paramount:
 

 Though it is a rule of inclusion, Rule 404(b) is still constrained by the requirements of similarity and temporal proximity. Prior acts are sufficiently similar if there are some unusual facts present in both crimes that would indicate that the same person committed them. We do not require that the similarities rise to the level of the unique and bizarre.
 

 State v. Beckelheimer
 
 ,
 
 366 N.C. 127
 
 , 131,
 
 726 S.E.2d 156
 
 , 159 (2012) (citation and quotation marks omitted). While cases examining the admissibility of evidence under Rule 404(b) often focus exclusively on similarity and temporal proximity, we remain cognizant that Rule 404(b) "is, at bottom, one of relevancy."
 
 State v. Jeter
 
 ,
 
 326 N.C. 457
 
 , 459,
 
 389 S.E.2d 805
 
 , 807 (1990) ;
 
 accord
 

 Carpenter
 
 ,
 
 361 N.C. at 388
 
 ,
 
 646 S.E.2d at 110
 
 ("In light of the perils inherent in introducing prior crimes under Rule 404(b),
 
 *891
 
 several constraints have been placed on the admission of such evidence. Our Rules of Evidence require that in order for the prior crime to be admissible, it must be relevant to the currently alleged crime." (citing N.C.G.S. § 8C-1, Rule 401 )).
 

 "When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, ... we look to whether the evidence supports the findings and whether the findings support the conclusions."
 

 *663
 

 Beckelheimer
 
 ,
 
 366 N.C. at 159
 
 ,
 
 726 S.E.2d at 159
 
 . "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)."
 

 Id.
 

 The trial court made the following oral findings of fact regarding the admissibility of testimony related to the Main Street Arson
 
 [2]
 
 :
 

 The State's 404(b) evidence would show the following. That in August of 2008 the Defendant used gasoline to set fire to a home at 600-on the 600 block of Main Street in Mooresville during the nighttime hours. Actually earlier to-closer to morning. That this gas was purchased at a nearby Pantry gas station. That the Defendant tried to set the fire with [cigarettes] but ultimately succeeded with a lighter. That she knew that the home was inhabited because she saw a vehicle belonging to [the homeowner]. [The homeowner] had, according to the Defendant, beat her while his father watched and done nothing at the time of this beating. It's unclear whether the beating-when this beating allegedly occurred. Sometime in the month to a year before.
 

 A K-9 trained in fires sniffed to locate possible incendiary material. Two pieces of wood were retrieved by the Fire Marshal and sent to a lab which turned out positive for gasoline. [Defendant] did not report the assault by [the homeowner] to the police at any time. [Defendant] admitted to drinking [Peach] Mad Dog 20-20 Vodka[, drinking several Bud Lights,] and also taking prescription [Clonozapine] pills which were prescribed to her. This
 
 *892
 
 fire was at the regular entrance way to the building-to the house or apartment. As in the instant case the fire was on the outside which, according to the Fire Marshal, makes it harder to detect by those inside. The damage in [the Main Street Arson] was much more extensive as shown by pictures introduced by the State.
 

 Unlike the instant case, the Defendant in [the Main Street Arson], her involvement, and also unlike the instant case, there's no real timeline between the beating and the fire. In the 2008 August case with-on Main Street, there was a Department of Social Services correlation in that apparently the Defendant was upset because her two year old had suffered a cut for which she believes the Department of Social Services blames her. The cut was treated on the Friday before the fire purportedly happened on the following early hours of Sunday morning. Unlike the instant case, the [Main Street Arson] appears planned, at least to the extent of purchasing gasoline and also the Defendant had another person with her.
 

 ....
 

 In [both the Main Street Arson and the Mills Street Arson], we find temporal closeness to the actual event for which we are trying the Defendant. Both events occurred within four years of this incident. In each of these cases-in all three cases there is evidence of use of incendiary materials and attempted burning at night in Mooresville in retaliation for a perceived wrong by the person or persons occupying a home. And in each case the Defendant claims to have been a victim but not follow through with police involvement or government involvement in assisting her to lawfully address the wrong but instead addresses it herself.
 

 After making these findings of fact, the trial court made the following oral conclusion of law regarding the admissibility of testimony related to the Main Street Arson:
 

 The State has offered [evidence regarding the Main Street Arson] as evidence of-allowed by 404(b), identity, intent, common scheme, plan, or motive. The Court will allow it to show intent. Finding that in both cases the commonalities are that they happened-each happened in Mooresville
 
 *664
 
 in
 
 *893
 
 the nighttime hours using an incendiary method; and the Court notes that fire is an unusual incendiary-unusual attack ...-well, attack method. That they each occurred against-at an entrance way which appears to be either the only entrance way or most common entrance way to the apartments against persons that the Defendant knew to be within. That she knew the buildings to be occupied, and that she had some grievance with or perceived harm from, and which she believed to be the victim; and on each occasion she was impaired by alcohol or some controlled substances in addition to alcohol. And she never reported such to the police. And in that occasion the probative value outweighs any prejudice to the Defendant.
 

 After review of the transcript of the proceedings and the trial court's findings and conclusions, we are convinced that the evidence presented during
 
 voir dire
 
 by the three 404(b) witnesses supports the trial court's findings of fact, which support the conclusion that the evidence was probative of Defendant's intent, rendering the evidence admissible pursuant to Rule 404(b). As found by the trial court, the Main Street Arson and the present case contained key similarities. Both arsons occurred in Mooresville during the nighttime hours, and both were set on the exterior of a building at a regular entranceway. In both cases, the perpetrator was intoxicated, knew the buildings to be occupied, and was angry about a "perceived harm" perpetrated against Defendant by the occupant of the residence. While Defendant, in her brief to this Court, has pointed to various differences between the Main Street Arson and the present case, we must not "focus[ ] on the differences between the [prior and current] incidents," but rather "review[ ] the[ ] similarities noted by the trial court."
 
 Beckelheimer
 
 ,
 
 366 N.C. at 160
 
 ,
 
 726 S.E.2d at 159
 
 (citation omitted). Reviewing those similarities here, we conclude the unusual facts of the two incidents are sufficiently similar to be admissible pursuant to Rule 404(b).
 

 We also find the evidence of the Main Street Arson to be logically relevant to Defendant's intent to commit the present crime. Defendant admitted to perpetrating the Main Street Arson, and both crimes displayed the similarities discussed above. The fact that Defendant attempted to commit arson at night, in the same town, and against a person from whom she had experienced a "perceived harm" logically bears on Defendant's intent to commit arson in similar circumstances in the present case.
 

 *894
 
 On the issue of temporal proximity, the Main Street Arson occurred approximately four years before the present incident. Cases from our Supreme Court have upheld the admissibility of 404(b) evidence with significantly longer periods between the past and present incidents.
 
 E.g.
 
 ,
 
 State v. Carter
 
 ,
 
 338 N.C. 569
 
 , 588-89,
 
 451 S.E.2d 157
 
 , 167-68 (1994) (affirming admissibility of 404(b) evidence of prior crime despite an eight-year lapse between assaults),
 
 cert. denied
 
 ,
 
 515 U.S. 1107
 
 ,
 
 115 S.Ct. 2256
 
 ,
 
 132 L.Ed.2d 263
 
 (1995). Considering that temporal proximity "is less significant when the prior conduct is used to show intent," we hold that the four-year gap between incidents does not affect the admissibility of the Main Street Arson evidence.
 
 State v. Locklear
 
 ,
 
 363 N.C. 438
 
 , 448,
 
 681 S.E.2d 293
 
 , 302 (2009) (holding that "remoteness in time generally affects only the weight to be given such evidence, not its admissibility").
 

 Having determined that the 404(b) evidence was sufficiently similar, logically relevant, and not too remote in time, we now review the trial court's Rule 403 determination. As relevant to this case, a trial court may exclude relevant evidence under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2015). A trial court's Rule 403 determination is reviewed for abuse of discretion.
 
 Beckelheimer
 
 ,
 
 366 N.C. at 132-33
 
 ,
 
 726 S.E.2d at 160
 
 . A review of the record in the present case reveals that the trial court was aware of the potential danger of unfair prejudice to Defendant, and excluded evidence of the Mills Street Arson under Rule 403.
 

 The trial court heard the testimony of the 404(b) witnesses outside the presence of the jury, considered the arguments of counsel,
 
 *665
 
 ruled on the admissibility of the evidence, and gave a proper limiting instruction to the jury for the Main Street Arson evidence admitted under Rule 404(b). Given the similarities between the Main Street Arson and the present case, and the trial court's deliberate determination of the admissibility of the 404(b) witnesses' testimony, we conclude that it was not an abuse of discretion for the trial court to determine that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.
 
 See
 
 id.
 
 ; see also
 

 State v. Hipps
 
 ,
 
 348 N.C. 377
 
 , 406,
 
 501 S.E.2d 625
 
 , 642 (1998).
 

 B.
 
 Ineffective Assistance of Counsel
 

 Defendant argues that she received ineffective assistance of counsel when her trial counsel declined to request a jury instruction on voluntary intoxication based upon counsel's misapprehension of the law. Generally, "claims of ineffective assistance of counsel should be
 
 *895
 
 considered through motions for appropriate relief and not on direct appeal."
 
 State v. Stroud
 
 ,
 
 147 N.C.App. 549
 
 , 553,
 
 557 S.E.2d 544
 
 , 547 (2001). However, an ineffective assistance of counsel claim brought on direct review "will be decided on the merits when the cold record reveals that no further investigation is required[.]"
 
 State v. Fair
 
 ,
 
 354 N.C. 131
 
 , 166,
 
 557 S.E.2d 500
 
 , 524 (2001). "[O]n direct appeal, the reviewing court ordinarily limits its review to material included in the record on appeal and the verbatim transcript of proceedings, if one is designated."
 
 Id
 
 . at 167, 557 S.E.2d at 524-25 (citation and quotation marks omitted). Here, the record on appeal and transcript of the proceedings suffice to show that Defendant's ineffective assistance of counsel claim is without merit; we therefore decide the claim on the merits on direct review.
 

 In order to show ineffective assistance of counsel, a defendant must satisfy the two-prong test announced by the Supreme Court of the United States in
 
 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 , 687,
 
 104 S.Ct. 2052
 
 , 2064,
 
 80 L.Ed.2d 674
 
 , 693 (1984). This test for ineffective assistance of counsel has been explicitly adopted by our Supreme Court for state constitutional purposes in
 
 State v. Braswell
 
 ,
 
 312 N.C. 553
 
 , 562-63,
 
 324 S.E.2d 241
 
 , 248 (1985). Pursuant to
 
 Strickland
 
 :
 

 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
 

 466 U.S. at 687
 
 ,
 
 104 S.Ct. at 2064
 
 ,
 
 80 L.Ed.2d at
 
 693 ;
 
 accord
 

 Braswell
 
 ,
 
 312 N.C. at 561-62
 
 ,
 
 324 S.E.2d at 248
 
 . "The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings."
 
 Braswell
 
 ,
 
 312 N.C. at 563
 
 ,
 
 324 S.E.2d at 248
 
 (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."
 
 Strickland
 
 ,
 
 466 U.S. at 694
 
 ,
 
 104 S.Ct. at 2068
 
 ,
 
 80 L.Ed.2d at 698
 
 . Therefore, "if a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would
 
 *896
 
 have been different, then the court need not determine whether counsel's performance was actually deficient."
 
 Braswell
 
 ,
 
 312 N.C. at 563
 
 ,
 
 324 S.E.2d at 249
 
 . "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "
 
 State
 

 v. Poindexter
 
 ,
 
 359 N.C. 287
 
 , 291,
 
 608 S.E.2d 761
 
 , 764 (2005) (quoting
 
 Wiggins v. Smith
 
 ,
 
 539 U.S. 510
 
 , 534,
 
 123 S.Ct. 2527
 
 , 2541-42,
 
 156 L.Ed.2d 471
 
 , 493 (2003) ).
 

 Defendant claims her trial counsel rendered ineffective assistance when counsel declined
 
 *666
 
 to request a jury instruction on voluntary intoxication because counsel believed the defense was required to present evidence before being entitled to request such an instruction. Presuming counsel's performance was deficient for incorrectly asserting that Defendant was not entitled to ask for a voluntary intoxication instruction without presenting some evidence, Defendant cannot show there to be a "reasonable probability" that the result of the trial would have been different, because Defendant was not entitled to a voluntary intoxication instruction, had one been requested.
 

 Voluntary intoxication in and of itself is not a legal excuse for a criminal act.
 
 State v. Gerald
 
 ,
 
 304 N.C. 511
 
 , 521,
 
 284 S.E.2d 312
 
 , 318 (1981). It is only a viable defense "if the degree of intoxication is such that a defendant could not form the specific intent required for the underlying offense."
 
 State v. Golden
 
 ,
 
 143 N.C.App. 426
 
 , 430,
 
 546 S.E.2d 163
 
 , 166 (2001). Before the trial court will be required to instruct on voluntary intoxication, a defendant must "produce substantial evidence which would support a conclusion by the trial court that at the time of the crime for which he is being tried defendant's mind and reason were so completely intoxicated and overthrown as to render him
 
 utterly incapable
 
 of forming the requisite specific intent."
 
 State v. Ash
 
 ,
 
 193 N.C.App. 569
 
 , 576,
 
 668 S.E.2d 65
 
 , 70-71 (2008) (emphasis added) (citation and quotation marks omitted). "In the absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon."
 
 Id.
 
 at 576,
 
 668 S.E.2d at 71
 
 . The evidence must be viewed in the light most favorable to the defendant,
 
 e.g.
 

 State v. Mash
 
 ,
 
 323 N.C. 339
 
 , 348,
 
 372 S.E.2d 532
 
 , 537 (1988), and a defendant is entitled to rely exclusively on the evidence produced by the State.
 
 See, e.g.
 
 ,
 
 State v. Herring
 
 ,
 
 338 N.C. 271
 
 , 275,
 
 449 S.E.2d 183
 
 , 186 (1994) ("A defendant who wants to raise the issue of whether he was so intoxicated by the voluntary consumption of alcohol or other drugs that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence,
 
 *897
 

 or relying on the evidence produced by the state
 
 , of his intoxication." (emphasis added) (citation and quotation marks omitted)).
 

 In the present case, Defendant argues that the evidence produced by the State was sufficient to entitle her to a voluntary intoxication instruction. To support her argument, Defendant points to various behaviors exhibited by Defendant on the night in question, including,
 
 inter alia
 
 , yelling profanities, inexplicably singing hymns, claiming to be the victim, attempting to take her shirt off to show law enforcement an injury, and passing out at the police department. While the evidence shows Defendant was intoxicated to some degree on 20 December 2011, we believe the evidence was insufficient to entitle her to a voluntary intoxication instruction.
 

 The evidence presented by the State did not establish how much alcohol Defendant had consumed prior to committing the crime at issue, which case law suggests is information of significant consequence to the determination of whether a defendant is entitled to a voluntary intoxication instruction.
 
 See
 

 Ash
 
 ,
 
 193 N.C.App. at 576
 
 ,
 
 668 S.E.2d at 71-72
 
 (concluding that a defendant was not entitled to a voluntary intoxication instruction when "there was no evidence as to exactly how much [intoxicating substance] he consumed prior to the commission of the crime at issue"). Nor did the State's evidence tend to show the length of time over which Defendant had consumed alcohol before committing the attempted arson in this case, a showing which must be made before a defendant is entitled to the instruction.
 
 See
 

 State v. Geddie
 
 ,
 
 345 N.C. 73
 
 , 95,
 
 478 S.E.2d 146
 
 , 157 (1996),
 
 cert. denied
 
 ,
 
 522 U.S. 825
 
 ,
 
 118 S.Ct. 86
 
 ,
 
 139 L.Ed.2d 43
 
 (1997) (concluding that "[e]vidence tending to show only that defendant drank some unknown quantity of alcohol over an indefinite period of time before the [crime] does not satisfy the defendant's burden of production" necessitating a voluntary intoxication instruction). The evidence presented in the present case revealed only that Defendant had consumed some amount of some type of alcohol over some unknown period of time prior to attempting arson. While Defendant's level of consumption before committing the crime is unknown, the evidence did establish that Defendant consumed some amount of alcohol after committing the attempted arson but before encountering
 
 *667
 
 law enforcement: at the time law enforcement approached Defendant, she had in her possession a "sports drink container" which had a "strong odor of alcoholic beverage."
 

 Defendant also took deliberate actions that suggest a clear purpose in carrying out the attempted arson. After engaging in a physical altercation with Houston, Defendant: (1) obtained a Mad Dog 20-20 bottle, a rag, and a lighter; (2) placed the rag partially into the bottle to form a
 
 *898
 
 "Molotov cocktail;" (3) lit the rag and threw the bottle at Houston's door; (4) exclaimed her desire to "burn [Houston] out," and (5) subsequently left the scene. These actions were not instantaneous and required Defendant to leave the scene, gather supplies, and return to Houston's door to carry out the crime. In addition to actions directly related to the attempted arson, when law enforcement approached Defendant, she quickly handed a container containing an alcoholic beverage to another person, indicating at least some level of awareness of her surroundings.
 
 See
 

 State v. Long
 
 ,
 
 354 N.C. 534
 
 , 538-39,
 
 557 S.E.2d 89
 
 , 93 (2001) (stating that steps "designed to hide the defendant's participation" in the crime demonstrates the ability to "plan and think rationally" and shows that the defendant was not so intoxicated that intent could not be formed);
 
 see also
 

 State v. Lemons
 
 ,
 
 225 N.C.App. 266
 
 ,
 
 736 S.E.2d 647
 
 ,
 
 2013 WL 152353
 
 , *5, 2013 N.C. App. LEXIS 41, *12-13 (2013) (unpublished) (noting that a voluntary intoxication instruction was not warranted when the defendant "acted with a clear purpose and intent in carrying out" the crime).
 

 While the behavior exhibited by Defendant, and cited by her appellate counsel to highlight her level of intoxication, was indeed bizarre, our courts have held that "a person may be excited, intoxicated and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention."
 
 Mash
 
 ,
 
 323 N.C. at 347
 
 ,
 
 372 S.E.2d at 537
 
 (citation and quotation marks omitted). While the evidence presented was sufficient to show Defendant was intoxicated to some degree, "[e]vidence of mere intoxication ... is not enough."
 
 Id.
 
 at 346,
 
 372 S.E.2d at 536
 
 . Given the lack of any evidence regarding Defendant's level of alcohol consumption on 20 December 2011 before committing the attempted arson, the uncertainty surrounding how quickly Defendant consumed that alcohol, the evidence establishing that Defendant was consuming alcohol after committing the attempted arson but before encountering law enforcement, evidence of a purposeful manner of carrying out the attempted arson, and evidence showing Defendant quickly handed off a container of alcohol as law enforcement approached her, indicating some level of awareness of her surroundings, we conclude that the evidence did not support a conclusion that Defendant was "so completely intoxicated and overthrown as to render [her] utterly incapable of forming the requisite specific intent."
 
 Ash
 
 ,
 
 193 N.C.App. at 576
 
 ,
 
 668 S.E.2d at 70-71
 
 . Defendant was, therefore, not entitled to a voluntary intoxication instruction.
 

 While a claim of ineffective assistance of counsel will be dismissed without prejudice when the claim has been "prematurely asserted on direct appeal,"
 

 *899
 

 State v. Warren
 
 , --- N.C. App. ----, ----,
 
 780 S.E.2d 835
 
 , 841-42 (2015), dismissal without prejudice is not appropriate when the "cold record reveals that no further investigation is required[.]"
 
 Fair
 
 ,
 
 354 N.C. 131
 
 , 166,
 
 557 S.E.2d 500
 
 , 524 (2001). In the present case, no further investigation into Defendant's ineffective assistance of counsel claim is required; the cold record reveals all of the evidence and testimony that was presented at trial regarding Defendant's level of intoxication, and shows that the evidence presented by the State fell short of the exacting standard our case law requires before entitling a defendant to a jury instruction on voluntary intoxication.
 
 E.g.
 

 Mash
 
 ,
 
 323 N.C. at 347
 
 ,
 
 372 S.E.2d at
 
 536-37 ;
 
 Geddie
 
 ,
 
 345 N.C. at 95
 
 ,
 
 478 S.E.2d at
 
 157 ;
 
 Ash
 
 ,
 
 193 N.C.App. at 576
 
 ,
 
 668 S.E.2d at 71-72
 
 . As Defendant was not entitled to a voluntary intoxication instruction, she has failed to show "that in the absence of counsel's alleged errors the result of the proceeding would have been different[.]"
 
 Braswell
 
 ,
 
 312 N.C. at 563
 
 ,
 
 324 S.E.2d at 249
 
 . We therefore reject Defendant's claim of ineffective assistance of counsel.
 

 *668
 
 C.
 
 Prior Record Level Calculation
 

 Defendant contends the trial court erred in adding a prior record level point to her prior record level calculation for sentencing purposes attributable to the time she spent on probation, parole, or post supervision. She argues the State failed to give proper notice of its intention to use the probation point in the calculation of her sentence, as required by N.C. Gen. Stat. § 15A-1340.16(a6). We agree.
 

 "The determination of an offender's prior record level is a conclusion of law that is subject to
 
 de novo
 
 review on appeal."
 
 State v. Bohler
 
 ,
 
 198 N.C.App. 631
 
 , 633,
 
 681 S.E.2d 801
 
 , 804 (2009) (citing
 
 State v. Fraley
 
 ,
 
 182 N.C.App. 683
 
 , 691,
 
 643 S.E.2d 39
 
 , 44 (2007) ). Pursuant to North Carolina's felony sentencing system, the prior record level of a felony offender is determined by assessing points for prior crimes using the method delineated in N.C. Gen. Stat. § 15A-1340.14(b)(1)-(7).
 
 See generally
 
 N.C. Gen. Stat. §§ 15A-1340.14(a) - (b) (2015). As relevant to the present case, a trial court sentencing a felony offender may assess one prior record level point "[i]f the offense was committed while the offender was on supervised or unsupervised probation, parole, or post-release supervision[.]" N.C. Gen. Stat. § 15A-1340.14(b)(7) (2015). Prior to being assessed a prior record level point pursuant to N.C.G.S. § 15A-1340.14(b)(7), however, our General Statutes require the State to provide written notice of its intent to do so:
 

 The State must provide a defendant with written notice of its intent to prove the existence of ... a prior record level point under G.S. 15A-1340.14(b)(7) at least 30 days
 
 *900
 
 before trial or the entry of a guilty or no contest plea. A defendant may waive the right to receive such notice. The notice shall list all the aggravating factors the State seeks to establish.
 

 N.C. Gen. Stat. § 15A-1340.16(a6) (2015).
 

 In the present case, the parties agreed, in a stipulation in the record on appeal, to the following:
 

 [The assistant district attorney] informed appellate counsel for [Defendant] that she gave notice of the State's intent to seek an extra point in the determination of [Defendant's] prior record level by including a copy of an AOC-CR-600 form ... with the discovery materials [the assistant district attorney] provided to the attorneys who represented [Defendant] in Iredell County Superior Court. The form ... contain[ed] contain[ed] a handwritten '+1' in the space beside the cell captioned "if the offense was committed: (a) while on supervised or unsupervised probation, parole, or post-release supervision." ... The [assistant district attorney] stated this is the standard manner the Iredell County District Attorney's Office provides notice of the State's intent to seek an additional prior record level point when an offense has been committed during a period in which the defendant was on probation.
 

 In addition to this stipulation, the following exchange occurred between the trial court and the prosecutor regarding whether Defendant had received notice of the State's intent to seek an extra prior record level point:
 

 THE COURT: And the extra point was noticed?
 

 [Prosecutor]: Yes, Ma'am. I gave them notice of that. I mean I provided that to [Defendant's counsel] in discovery.
 

 THE COURT: All right.
 

 This Court recently held in a factual situation similar to the present case, that the State's notice of its intent to prove a prior record level point authorized by N.C. Gen. Stat. § 15A-1340.14(b)(7) by including a prior record level worksheet in discovery materials is insufficient to meet N.C.G.S. § 15A-1340.16(a6) 's notice requirement.
 
 See
 

 State v. Crook
 
 , --- N.C. App. ----,
 
 785 S.E.2d 771
 
 (2016). In
 
 Crook
 
 , the defendant argued the trial court erred by including the probation, parole, or
 
 *901
 
 post-release supervision point and sentencing him as a prior record level II offender because the State did not provide him with notice of intent under N.C.G.S. § 15A-1340.16(a6).
 
 Crook
 
 , --- N.C. App. at ----,
 
 785 S.E.2d at 780
 
 .
 

 In response, the State contended that the "defendant's prior record level worksheet was made available to [him] in discovery ... more than 30 days prior to the trial" and that, as such, "the defendant was provided
 
 *669
 
 notice of his prior record level calculation of a prior record level II with two prior record level points[.]"
 

 Id.
 

 In rejecting this argument, this Court held that including a prior record level worksheet during discovery "[a]t most ... constituted a possible calculation of [the d]efendant's prior record level and did not provide affirmative notice that the State intended to prove the existence of the prior record point authorized by N.C. Gen. Stat. § 15A-1340.14(b)(7) as required by N.C. Gen. Stat. § 15A-1340.16(a6)."
 
 Crook
 
 , --- N.C. App. at ----,
 
 785 S.E.2d at 780
 
 (citation omitted). This court noted that "the State had the ability to comply with the statute using regular forms promulgated for this specific purpose by the Administrative Office of the Courts."
 

 Id.
 

 (citation and quotation marks omitted).
 

 Pursuant to this Court's recent holding in
 
 Crook
 
 , the State must provide a defendant with notice of intent to prove the existence of a prior record level point authorized by N.C.G.S. § 15A-1340.14(b)(7) at least thirty days prior to trial, and must provide notice of its intent in some manner other than including a prior record level worksheet in the discovery documents made available to a defendant. In the present case, notice to Defendant was lacking, as the State only communicated its intent to prove the aggravating factor by including a handwritten notation on a form provided through discovery. This notation "[a]t most ... constituted a possible calculation of Defendant's prior record level and did not provide affirmative notice that the State intended to prove the existence of the prior record point[.]"
 
 Crook
 
 , --- N.C. App. at ----,
 
 785 S.E.2d at 780
 
 (citation omitted). The fact that there was a short exchange between the prosecutor and the trial court in no way changes this calculus, because no separate notice was provided to Defendant as required by
 
 Crook
 
 . Although Defendant failed to object at trial to the State's failure to provide notice, "[i]t is not necessary that an objection be lodged at the sentencing hearing in order for a claim that the record evidence does not support the trial court's determination of a defendant's prior record level to be preserved for appellate review."
 
 Bohler
 
 ,
 
 198 N.C.App. at 633
 
 , 681 S.E.2d at 804.
 

 *902
 
 The State's argument that
 
 State v. Snelling
 
 ,
 
 231 N.C.App. 676
 
 ,
 
 752 S.E.2d 739
 
 (2014) controls the present case and requires an opposite conclusion is unavailing. In
 
 Snelling
 
 , the defendant argued,
 
 inter alia
 
 , that the trial court erred by sentencing him as a higher prior record level offender because it failed to comply with the sentencing procedure mandated by N.C. Gen. Stat. § 15A-1022.1.
 
 Snelling
 
 ,
 
 231 N.C.App. at 680-81
 
 ,
 
 752 S.E.2d at 743
 
 . N.C.G.S. § 15A-1022.1 requires a trial court to inform a defendant of his or her right to have a jury determine the existence of an aggravating factor, and the right to prove the existence of any mitigating factor.
 
 Snelling
 
 ,
 
 231 N.C.App. at 680
 
 ,
 
 752 S.E.2d at
 
 743 ; N.C. Gen. Stat. § 15A-1022.1 (2015). After examining the statute and the facts of the case, the
 
 Snelling
 
 Court held that because the defendant stipulated to his prior record level status, such status was a "non-issue."
 
 Snelling
 
 ,
 
 231 N.C.App. at 681-82
 
 ,
 
 752 S.E.2d at 744
 
 . "Within the context of defendant's sentencing hearing," the Court reasoned, "the procedures specified by N.C. Gen. Stat. § 15A-1022.1 would have been inappropriate."
 
 Snelling
 
 ,
 
 231 N.C.App. at 682
 
 ,
 
 752 S.E.2d at 744
 
 (citation omitted).
 

 The State argues that, like in
 
 Snelling
 
 , Defendant's prior record level status was a non-issue, and she "waived any requirement for notice pursuant to N.C. Gen. Stat. § 15A-1340.16(a6) by failing to respond to the trial court's direct inquiry as to whether the extra point was noticed." This argument fails for several reasons.
 

 First, the "trial court's direct inquiry" regarding notice was not directed at Defendant or her counsel; rather, it was a conversation between the trial court and the prosecutor. Second, to hold that Defendant's argument was waived would contravene this Court's longstanding precedent that an objection is not necessary in order to preserve a "claim that the record evidence does not support the trial court's determination of a defendant's prior record level[.]"
 
 Bohler
 
 ,
 
 198 N.C.App. at 633
 
 , 681 S.E.2d at 804. Third, the portion of
 
 Snelling
 
 on which the State relies was discussing N.C.G.S. § 15A-1022.1, a separate statute from the one at issue in the present case, N.C.G.S. § 15A-1340.16(a6). The purposes of these two statutes
 
 *670
 
 are very different: N.C.G.S. § 15A-1022.1 deals with sentencing procedure to be followed by the
 
 sentencing judge
 
 , while N.C.G.S. § 15A-1340.16(a6) deals with notice
 
 the State
 
 must provide to a defendant of its intent to prove a fact which will increase his or her sentence. Finally, after the
 
 Snelling
 
 Court addressed, and dismissed, the defendant's argument related to N.C.G.S. § 15A-1022.1, the Court
 
 agreed with the defendant
 
 that N.C.G.S. § 15A-1340.16(a6) 's notice requirements had been violated, and that violation required a new sentencing hearing.
 
 See
 

 Snelling
 
 ,
 
 231 N.C.App. at 682
 
 ,
 
 752 S.E.2d at 744
 
 ("Here, the trial court
 
 *903
 
 never determined whether the statutory requirements of N.C. Gen. Stat. § 15A-1340.16(a6) were met. Additionally, there is no evidence in the record to show that the State provided sufficient notice of its intent to prove the probation point. Moreover, the record does not indicate that defendant waived his right to receive such notice.").
 

 Under this Court's holding in
 
 Crook
 
 , the notice provided to Defendant in the present case was insufficient to meet the notice requirements of N.C.G.S. § 15A-1340.16(a6), and the record does not indicate Defendant waived her right to such notice. Accordingly, the trial court erred in sentencing Defendant as a prior record level III offender. We therefore vacate Defendant's sentence and remand this case for Defendant to be resentenced as a prior record level II offender. As Defendant has noted in briefing to this Court, there is at least some possibility that, upon resentencing, Defendant may be entitled to her immediate release because she would have served her entire sentence. We express no opinion on resentencing or on Defendant's proper sentence. However, due to this possibility and to hasten Defendant's resentencing, we direct, pursuant to N.C. R. App. P. 32(b), that the mandate issue immediately upon the filing of this opinion.
 

 NO ERROR IN PART; JUDGMENT VACATED; REMANDED FOR RESENTENCING.
 

 Judges STROUD and TYSON concur.
 

 [1]
 

 We note the discrepancy between Captain Cooke's and Houston's testimony: Captain Cooke asserted he observed the broken glass, while Houston repeatedly maintained she cleaned up the glass before law enforcement arrived.
 

 [2]
 

 At the time the trial court made these oral findings of fact and conclusions of law, it declared the ruling to be a "very rough copy of the ruling," and that it would "look at it and make [the ruling] prettier as the week [went] on." Despite this statement, no revised copy of the trial court's ruling (oral or written) appears in the transcript or record on appeal. Immediately following the trial court's ruling, several minor factual errors were brought to the court's attention by the State and agreed to by Defendant. For clarity and ease of reading, we have removed the erroneous information and placed the correct information in brackets.